UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE:<br><br>James Edward Whitley,<br><br>       Debtor.<br>_____<br><br>Charles M. Ivey, III, Trustee for Estate of James Edward Whitley,<br><br>       Plaintiff,<br><br>vs.<br><br>Foy Eugene Grubb, Jr.,<br><br>       Defendant. | Case No. 10-10426C-7G<br><br><br><br><br><br><br><br>Adversary No. 11-2027 |

## MEMORANDUM OPINION

This adversary proceeding came before the court on March 5, 2013, for hearing on Defendant's Motion for Partial Summary Judgment. Christine L. Myatt and Brian Anderson appeared on behalf of the Defendant and Edwin R. Gatton appeared on behalf of the Plaintiff.

### MATTER BEFORE THE COURT

The Plaintiff seeks in this proceeding to avoid and recover from the Defendant certain payments that the Defendant received from the Debtor on the theory that such payments were fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.1, et seq. The Defendant asserts that the

payments were received by the Defendant for value and in good faith and that the Defendant therefor is entitled to retain the funds pursuant to section 548(c) of the Bankruptcy Code and N.C. Gen. Stat. § 39-23.8(a). In the motion for summary judgment, the Defendant asserts that there is no genuine issue of material fact regarding whether he received the payments for value and in good faith and that summary judgment should be entered in his favor pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure.

I. Nature of the Plaintiff's Claims

The Plaintiff's claims rely upon the presumption of fraud that arises when a Ponzi scheme has been perpetrated.[1] According to the Plaintiff's allegations, during the period when the transactions involving the Debtor and the Defendant occurred, the Debtor presented himself to the public as owning and operating a factoring business involving invoice funding and receivables financing. The Debtor engaged in promotions, including a website and direct solicitation, to promote the appearance that he was engaged in the

---

[1] See, e.g., In re Grafton Partners, 321 B.R. 527, 532 (B.A.P. 9th Cir. 2005); Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Emerson v. Maples (In re Mark Benskin Co., Inc.), 1995 WL 381741, at *5 (6th Cir. 1995); Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC), 439 B.R. 284, 305 (S.D.N.Y. 2010), In re Bernard L. Madoff Inv. Secs. LLC, 445 B.R. 206, 220-21 (Bankr. S.D.N.Y. 2011); In re Taneja, 453 B.R. 618, 621 (Bankr. E.D. Va. 2011); Liebersohn v. Campus Crusade for Christ, Inc. (In re C.F. Foods, L.P.), 280 B.R. 103, 110 (Bankr. D. Pa. 2002); Jobin v. Ripley (In re M & L Bus. Mach. Co., Inc.), 198 B.R. 800, 806-07 (D. Colo. 1996).

factoring business. The Debtor enticed various individuals, including the Defendant, to loan him funds which the Debtor represented would be used in his alleged factoring business. The Debtor did so by offering high rates of return for investors. Through such representations, the Debtor enticed individuals to provide funds to the Debtor. While he was soliciting such investments, the Debtor actually was conducting little or no business activities, but continued to represent that he was doing so to his investors. To the extent that the Debtor made payments to investors as income or repayments of principal, such payments were funded from additional funds that the Debtor had obtained from other investors, and not from any income or profits generated from genuine business operations. The Debtor's scheme collapsed in March of 2010 when an involuntary bankruptcy case was commenced against him. Based upon the Debtor's involvement in a Ponzi scheme when he transferred the payments at issue to the Defendant, the Plaintiff maintains that there is a presumption that such payments were made by the Debtor with actual intent to defraud, and the payments may therefore be recovered under 11 U.S.C. § 548(a)(1)(A) and N.C. Gen. Stat. § 39-23.1.

II. The Defendant's Motion for Summary Judgment

The Defendant's motion does not challenge the Plaintiff's allegation that the Debtor was engaged in a Ponzi scheme. Nor does the motion challenge the Plaintiff's contention that the payments

to the Defendant were made in the course of the Debtor's Ponzi scheme such that there is a presumption that the payments were made by the Debtor with fraudulent intent. The Defendant asserts, instead, that even if the payments were made by the Debtor with fraudulent intent, the Defendant nonetheless is entitled to retain the payments under section 548(c). Thus, for the purpose of deciding the Defendant's motion for summary judgment, the allegation that the Debtor was engaged in a Ponzi scheme will be accepted and it will be presumed that the payments that the Defendant received were made by the Debtor with actual intent to defraud. This means that the only issues for consideration at this time are those which arise under section 548(c).

III. Analysis of Good Faith Requirement under Section 548(c)

Under section 548(c), a transferee "that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer. . . ." Section 548(c) functions as an affirmative defense in a fraudulent conveyance proceeding with the result that the defendant/transferee has the burden of proving both the value and the good faith elements of section 548(c). E.g. Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.), 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999)("[Section 548(c)] has been construed as an affirmative defense, all elements of which must be proven by the

defendant-transferee."). To meet this burden, the evidence relied upon by the Defendant must be sufficient to satisfy the legal requirements of "value" and "good faith," as those terms are utilized in section 548(c).

The Defendant's argument that good faith should be determined according to a subjective standard under which good faith may be satisfied by a showing that a transferee did not have actual knowledge of any fraud on the part of the Debtor is not accepted. Instead, for the reasons that follow, the court concludes that good faith in this proceeding should be determined according to an objective standard under which good faith is dependent upon whether the circumstances known to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and whether a diligent inquiry would have discovered the fraudulent purpose.

As many courts and commentators have noted, the Bankruptcy Code does not provide a definition of "good faith." While most courts have not attempted to provide a precise definition of the phrase, courts have formulated various principles and criteria for use in determining whether a transfer was received in good faith for purposes of section 548(c). See In re Telesphere Commc'ns, Inc., 179 B.R. 544, 557 (Bankr. N.D. Ill. 1994)("the courts have varied widely in the general approach they have taken in deciding questions of good faith in the context of fraudulent conveyance law"). While the principles and criteria that have been adopted

vary from case to case, they do agree that good faith should be determined on a case-by-case basis and depends upon the particular circumstances of each case. E.g., Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995)("Good faith is not susceptible of precise definition and is determined on a case-by-case basis.").

In deciding upon the principles or criteria that the court should apply in this proceeding, the court begins with the case of Goldman v. Capital City Mort. Corp. (In re Nieves), 648 F.3d 232 (4th Cir. 2011), the most recent and perhaps most extensive discussion of good faith by the Fourth Circuit Court of Appeals. Although the good faith issue in Nieves arose under section 550(b)(1)[2], the court is satisfied that what is said in Nieves regarding "good faith" should apply equally to "good faith" as used in section 548(c), given that the identical term is used in both sections and in both sections such term is used in the context of determining whether a transferee will be allowed to retain an avoidable transfer. In Nieves, the court held that "good faith, as used in section 550(b)(1), should be determined under an objective standard." Consistent with this holding, good faith in a proceeding involving section 548(c), likewise should be determined under an objective standard.

---

[2] Under section 550(b)(1), a trustee may not recover an avoided transfer from an immediate or mediate transferee "that takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided . . . ."

In applying the objective standard, the court in Nieves affirmed the decision of the bankruptcy court that utilized a two-step approach to determining whether a transferee received a transfer in good faith. This approach involved first determining whether the defendant was placed on inquiry notice by the facts known to the transferee and, secondly, upon finding that such facts were present, then determining whether a reasonable inquiry would have disclosed the voidability of the transfer at issue. Regarding the first component, the court held that "the bankruptcy court applied the correct legal standard of objective good faith and we affirm as not clearly erroneous its factual finding that the facts known to CCM would have lead 'a lender under the circumstances of this case [to] inquire as to the record.'" Nieves, 648 F.3d at 241. Regarding the second component, the court stated that "[h]ad CCM conducted a reasonable search it would have discovered a number of facts pointing toward the voidability of the transfers." Id. at 242.

The court made clear in Nieves that under section 550(b)(1), whether an inquiry regarding a transfer is required depends upon the facts that were actually known by the transferee when the transfer was received and that a reasonable inquiry is the standard when a transferee is on inquiry notice. This court concludes that the same is true in determining good faith under section 548(c). Accordingly, consistent with Nieves, if (1) the circumstances known

to the transferee would place a reasonable person on notice that the transfer might be fraudulent, and (2) a diligent inquiry would have discovered the fraudulent purpose, then there is a lack of good faith on the part of the transferee. In accord, Jobin, 84 F.3d at 1338; In re Bayou Grp., LLC, 439 B.R. 284, 313-14 (S.D.N.Y. 2010)(collecting cases). Under this standard, an objective, reasonable person standard applies to both the inquiry notice and the diligent investigation components of the good faith test. Jobin, 84 F.3d at 1334-35 (expressly rejecting a subjective standard under which a transferee would not lack good faith unless he had actual knowledge of the fraudulent nature of the transfer); Bayou, 439 B.R. at 313. In this proceeding, application of the objective standard means that the first component of the above-described test will be governed by the facts that were actually known by the Defendant when the payments were received from the Debtor, and whether such circumstances would have placed a reasonable person on notice that the payments might be fraudulent. If a reasonable person would have been on notice, the relevant question then becomes whether an inquiry, if made with reasonable diligence, would have led to the discovery of the fraudulent nature of the payments. Id. at 316; Wiand v. Waxenberg, 611 F.Supp.2d 1299, 1319-20 (M.D. Fla. 2009).

    IV.  Summary Judgment Standard in This Proceeding

    Where, as in this proceeding, the moving party has the burden

of proof at trial, the standard for granting summary judgment is more stringent. Nat'l State Bank v. Fed. Reserve Bank, 979 F.2d 1579, 1582 (3rd Cir. 1992). See also Ray Comm. v. Clear Channel Commc'n, Inc., 673 F.3d 294, 299 (4th Cir. 2012)("Where, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense."). Where the movant has the burden of proof, the summary judgment standard mirrors the standard applicable when a trial court is ruling on a motion for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. See 9 James Wm. Moore et al., Moore's Federal Practice ¶ 50.06[6][b] (3d ed. 2012)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986)(motion for summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)")). The standard in this proceeding, therefore, is the same as the standard for determining whether a judgment may be directed under Rule 50 in favor of a party with the burden of proof. As the Fourth Circuit explained in Sales v. Grant, 155 F.3d 768, 775 (4th Cir. 1998), under the applicable standard the non-moving party "must be given the benefit of every reasonable inference that could be drawn from the evidence, neither weighing the evidence not assessing its credibility" and the motion can be granted "only if, by [such] assessment, the only conclusion a reasonable jury could draw from the evidence" is in favor of

moving party. The motion must be denied if "reasonable minds could differ as to the conclusion to be drawn from the evidence." Id.; See 9 Moore et al., ¶ 50.05[2] n.6 ("granting judgment for party with burden of proof possible only when evidence favoring movant is overwhelming"). The Defendant has failed to satisfy this stringent standard.

According to the Defendant's evidence, he began making loans to the Debtor in 2002. The Defendant's first loan was in January of 2002 in the amount of $60,000, followed by a $50,000 loan in January of 2005, a $25,000 loan in August of 2005, a $25,000 loan in September of 2006, a $100,000 loan in June of 2008 and a $75,000 loan in July of 2009, for total loans of $335,000. From August of 2002 through December of 2008, the Defendant received thirty-seven periodic payments from the Debtor ranging in amount from $1,600 to $18,000 and totaling $124,200, not including a check for $12,000 received in July of 2009 which bounced. According to the Defendant, the interest rate on these loans ranged between ten percent and forty percent per annum. The initial interest rate of fifteen percent was reduced to ten percent and then increased to an annual percentage rate of forty percent for a loan made in July of 2008. The facts and circumstances surrounding these transfers raise an issue of fact regarding whether a reasonable person would have been placed on notice that the transfers might be fraudulent.

At the time the Defendant made these loans, the Defendant knew

little about the Debtor or his business activities. The Debtor was not a personal friend or close business associate of the Defendant. The Debtor was one of the Defendant's many patients, both men had been involved in a youth soccer program, and the Defendant had played golf with the Debtor a few times. The extent of the Defendant's information regarding the Debtor's business was that the Debtor had told the Defendant that he was engaged in the funding or factoring business and that the business involved lending money to companies that did not have enough money to pay the employees or buy the materials needed to fund a contract. The Debtor never provided the Defendant with any brochures, advertising materials, or other documentation containing information regarding his alleged factoring business. At some point prior to 2002, the Debtor told the Defendant that he sometimes needed to borrow money in order to finance factoring deals and that he offered an attractive interest rate on such loans. When the Debtor thereafter approached the Defendant in early 2002 about his investing with the Debtor, the Defendant began making loans to the Debtor, beginning with a $60,000 loan or investment.

When he made the loans, the Defendant was an experienced investor with various investments such as stocks, bonds, savings accounts, and mutual funds, and had a financial adviser who advised him regarding his investments. But the Defendant had not previously engaged in lending activities involving loans that were extended in

order to obtain a return or profit. The amounts of the loans that the Defendant made to the Debtor represented substantial outlays for the Defendant considering the Defendant's financial circumstances. Yet, the Defendant did not make any type of investigation or conduct any type of due diligence regarding the Debtor or the business the Debtor had vaguely described before he began making loans to the Debtor. The Defendant did not seek any advice from his financial advisor regarding the loans to the Debtor. In approximately 2005, the Defendant received information that the name of the Debtor's factoring business was South Wynd Financial and he reviewed a website for South Wynd at that time. The Defendant also asked two golfing buddies about the Debtor and was told by one that the Debtor's factoring business was OK and by the other that his employer, a bank, did not do business with the Debtor because it was too risky. Based on his experience from his other investments, the Defendant was aware that he received regular statements and reports regarding such investments. But the Defendant never received any reports or statements, written or otherwise, from the Debtor regarding his business or the factoring deals allegedly funded by the loans from the Defendant. Even so, the Defendant never sought to obtain information from the Debtor regarding his business, such as the existence or location of a business office, the number of employees, a list of customers, or the particular factoring deals for which the loans were sought.

Although the Defendant understood that the Debtor had a factoring business and that the loans were for use in the business, the checks written by the Defendant to fund the loans were made payable to the Debtor personally and not to a business even after the Defendant had become aware of South Wynd Financial. Some of the payments received from the Debtor were made in cash, and when checks were received from the Debtor, the checks were drawn on the Debtor's personal account and not any type of business account. Although the Defendant had obtained business and personal loans from lenders in the past and was aware that formal printed documents were required for those loans, including printed promissory notes containing extensive terms, the documentation received from the Debtor was much different, and consisted of documents prepared by the Debtor on a single sheet of paper. These documents were scarcely more than IOUs and most were "open-ended demand notes" that included little more than the amount of the loan, a date, and the Debtor's signature, and in some cases were handwritten.

The Defendant knew very little in general regarding the nature of the factoring business and in particular had no information regarding the profit margins for the Debtor's factoring or funding business. The Defendant was aware of the returns that he was receiving on his other investments and bank accounts and knew that the interest rates that he was receiving from the Debtor were

significantly greater than he was able to obtain from any other source, particularly with respect to the loan in which the Debtor agreed to an interest rate with an annual percentage rate of forty-percent. The $75,000 loan that the Defendant made in June of 2008 occurred after the Debtor telephoned the Defendant seeking an immediate loan. This call was made while the Defendant was out of town on vacation. In response to the Debtor's urgent call, the Defendant went to the bank in Morehead City at which the Debtor had an account and made a $75,000 deposit directly into the Debtor's checking account. In order to obtain this loan, the Debtor agreed to pay an annual percentage rate of forty-percent and to repay the note within ninety days. The Defendant was still dealing with the Debtor in July of 2009 when a $12,000 check from the Debtor was dishonored by the Debtor's bank because of insufficient funds in the Debtor's bank account.

The Defendant's loans to the Debtor were not extended as a favor to a friend. The loans were business transactions which were prompted by a profit motive, i.e., the interest the Debtor was willing to pay the Defendant in order to obtain the loans. The Defendant made these loans with little knowledge regarding the Debtor's alleged business and with virtually no due diligence. By any measure, the loans were at the high end of the risk scale. One inference that could be drawn is that the interest rate that was required in order to induce the Defendant to take the substantial

risk associated with making large loans to the Debtor was of a magnitude that should have prompted inquiry regarding the Debtor.

When these circumstances and the reasonable inferences that follow are examined under the standard articulated in <u>Sales v. Grant</u>, the court does not find that the only conclusion that a jury could draw in this case would be in favor of the Defendant. The situation, instead, is one in which reasonable minds could differ as to whether the facts and circumstances known to the Defendant would have placed a reasonable person on inquiry notice regarding the Debtor's fraudulent purpose and as to whether a reasonable inquiry would have disclosed the Debtor's fraud. The Defendant, therefore, is not entitled to summary judgment with respect to the good faith issue.

V. Analysis of the Value Requirement under Section 548(c)

A good faith transferee can prevent the avoidance of a challenged transfer under section 548(a)(1)(A) and N.C. Gen. Stat. § 39-23.1 by demonstrating that he took the transfer in exchange for value. "Value" is defined both in the Bankruptcy Code and under the North Carolina Fraudulent Transfer Act to include a transfer in exchange for the satisfaction of an antecedent debt. N.C.Gen.Stat. § 39-23.3(a); 11 U.S.C. § 548(d)(2)(A). In the case of Ponzi schemes, the general rule is that a defrauded investor gives "value" to a debtor in exchange for payments that in the aggregate do not exceed the principal amount of the investment, but not as to

any payments in excess of principal. Perkins v. Haines, 661 F.3d 623, 627 (11th Cir.2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Scholes v. Lehmann, 56 F.3d 750, 757-58 (7th Cir. 1995). Under a concept referred to as the "netting rule" most courts determine the liability of an investor in a Ponzi scheme by comparing the amount of a defendant's principal investment with the aggregate amount received in return on the investment. See Donnell, 533 F.3d at 770. An investor who receives a positive return on investment is liable under the fraudulent conveyance statute for any amount received in excess of the investor's principal investment, regardless of whether the investor received the payments in good faith, because payments in excess of principal are not made for value. Id. Where payments received by a defendant in good faith do not exceed a defendant's principal investment however, these payments are supported by value and a defendant is entitled to retain the amounts under 11 U.S.C. § 548(c). See In re Lake States Commods., Inc., 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000) (collecting cases).

From January 2002 until July 15, 2009, the Defendant invested a total of $335,000 with the Debtor and received $124,200 in payments from the Debtor. Put another way, the Defendant is a net loser because he invested approximately $210,000 more in the Debtor's Ponzi scheme than he received in return. The Plaintiff produced no evidence to rebut and apparently does not dispute the

Defendant's evidence that he did not receive payments from the Debtor in excess of his principal. Under these facts, which clearly show that the Defendant is a net loser, the court concludes that there is no material issue of fact regarding whether the Defendant "gave value" under section 548(c) nor as to the extent of the value given by the Defendant, such value being equal to the full amount of the payments received from the Debtor. The Defendant, therefore, is entitled to summary judgment with respect to the value requirement under section 548(c).

VI. Conclusion

Based upon the foregoing, the court concludes that the Defendant's motion for summary judgment should be denied as to whether the transfers from the Debtor were received in good faith and should be granted as to whether the Defendant gave value for the payments received from the Debtor. An order so providing shall be entered contemporaneously with the filing of this memorandum opinion.

This 1st day of May, 2013.

_____
WILLIAM L. STOCKS
United States Bankruptcy Judge

PARTIES IN INTEREST

Edwin R. Gatton, Esq.
P.O. Box 3324
Greensboro, NC 27402

Christine L. Myatt, Esq.
Brian Anderson, Esq.
P.O. Box 3463
Greensboro, NC 27408